UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TESS M. CHAPMAN,                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        No.  4:08CV67 RWS
                                          )                    (TIA)
MICHAEL J. ASTRUE,                        )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
                Defendant.                )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial

of Plaintiff's application for Supplemental Security Income under Title XVI of the Social Security

Act, 42 U.S.C. §§ 1381 et seq. and Childhood Disability Benefits under §§ 202(d) and 223 of the

Act.[1]  The case was referred to the undersigned for a Report and Recommendation pursuant to 28

U.S.C. § 636(b).

## I.  Procedural History

On November 28, 2005, Plaintiff filed an application for Supplemental Security Income under

Title XVI of the Social Security Act, claiming disability beginning April 1, 1999 due to major

depression, bipolar disorder, anxiety disorder, oppositional defiant disorder, and borderline

personality.  (Tr. 38-40, 104)  Plaintiff's application was denied, after which she filed a request for

a hearing.  (Tr. 28-33, 48-49)  On January 30, 2007, Plaintiff testified at a hearing before an

Administrative Law Judge (ALJ).  (Tr. 373-385)  On February 23, 2007, the ALJ entered a decision,

---

[1]  The ALJ refers to an application for disabled adult child's benefits under sections 202(d)
and 223 of the Social Security Act.  Although the undersigned has been unable to locate such
application, a Disability Determination and Transmittal indicates that Plaintiff filed a concurrent
case for Childhood Disability Benefits.  (Tr. 48)

finding that Plaintiff was not under a disability as defined by the Social Security Act at any time through the date of the decision and was not eligible for Supplemental Security Income or entitled to disabled adult child's benefits. (Tr. 12-23) The Appeals Council denied Plaintiff's request for review on November 19, 2007, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 4-6) Plaintiff then filed a Complaint in federal court on January 16, 2008.

## II.  Evidence Before the ALJ

On January 30, 2007, Plaintiff appeared with counsel at a hearing before an ALJ. Plaintiff was twenty years-old at the time of the hearing. She testified that she completed the 8th grade, after which she was expelled from school. Plaintiff stated that she was working on her GED, and she planned to take the exam in the next couple of months. Plaintiff's past work included jobs as a telemarketer and cook for a duration of less than 6 months. Plaintiff testified that she never held a job for 6 months. Her job as a telemarketer was too much pressure, and her anxiety prevented her from keeping the job. She also stated that the high pressure and her severe depression caused her to leave her job as a cook. (Tr. 375-76)

Plaintiff testified that she saw Dr. Faber once every month at the BJC facility in North County, St. Louis. She had not consumed alcohol or smoked Marijuana for a long time because she did not want to mix those substances with her antidepressants. Plaintiff stated that her psychological problems were "constricting and oppressive." They prevented her from leaving the house, doing normal things, living a normal life, and sleeping. Plaintiff explained that the idea of leaving the house caused her to be anxious, paranoid, and worried that something terrible would happen to her. She testified to experiencing panic attacks. (Tr. 376-77)

Plaintiff further stated that she saw Desmond, her case worker, at BJC. Desmond drove Plaintiff to the hearing, and she assisted Plaintiff with setting and reaching goals to overcome her depression. Plaintiff testified that Desmond also occasionally visited her at home. Plaintiff received help from Desmond once or twice a month, or whenever Plaintiff called for help. (Tr. 378-79)

Plaintiff reported that she took naps during the day a couple of times a week. She last attempted suicide 6 years ago but testified to having suicidal thoughts a couple times a month since then. However, Plaintiff did not have any suicidal plans. (Tr. 379)

A vocational expert (VE), Gary Weimholt, also testified at the hearing. The ALJ posed several hypothetical questions to the VE. On behalf of the State doctors, the ALJ asked the VE to assume the hypothetical claimant was 20 years old, with an 8th grade education. The claimant could understand, remember, and carry out at least simple instructions and non-detailed tasks. The claimant had demonstrated adequate judgment to make simple work-related decisions, could respond appropriately to supervisors and co-workers, and could adapt to simple work changes. The claimant also had no physical restrictions. Given this hypothetical, the VE testifies that such claimant could perform work in the national or state economies. Such jobs included packing line worker, which was light work. Some 8000 of these jobs existed in the state economy. In addition, such claimant could work as a fast food worker, which was an unskilled, light job. There were approximately 10,000 fast food worker jobs in the state economy and 50 times that in the national economy. (Tr. 379-80)

The ALJ asked a hypothetical based on Dr. Baber's report. The hypothetical claimant possessed the same background information and no physical restrictions. The claimant could understand, remember, and carry out at least simple instructions and non-detailed tasks. In addition, the claimant could respond appropriately to supervisors and co-workers in a task-oriented setting

where contact with others was casual and infrequent. This hypothetical claimant could adapt to simple work changes and take appropriate precautions to avoid hazards. However, this claimant should perform no work involving significant contact with the general public. The claimant could maintain regular attendance and be punctual. In light of these restrictions, the VE testified that such claimant could still work as a packing line worker but not a fast food worker. The VE would also include all other assemblers of small products, which was light work. Approximately 10,000 such jobs existed in the state economy. (Tr. 381)

The ALJ based the final hypothetical on the residual functional capacity findings of Robert E. Schlitt, Ph.D., who performed a psychological evaluation of Plaintiff on April 7, 2006 at the request of Plaintiff's attorney. (Tr. 227-36) Based upon Dr. Schlitt's report, there would be no other work that the hypothetical claimant could perform. (Tr. 382) Plaintiff's attorney also presented a hypothetical situation to the VE. The attorney asked the VE to consider a hypothetical individual with the same age, education, and lack of past relevant work experience as the Plaintiff. Such claimant had no physical limitations but possessed marked mental limitations that seriously interfered with the ability to function independently, appropriately, and effectively. This limitation prevented the claimant from functioning eight hours a day, five days a week, or on an equivalent work schedule. The limitation was more than moderate, but less than extreme. This claimant also possessed a marked limitation in the ability to relate in social situations and could not perform a basic mental activity in regular competitive employment, only in a sheltered work setting with special considerations and attention. The individual also had substantial loss of ability to respond appropriately to supervision, co-workers, and usual work situations. In addition, the claimant had a substantial loss of ability to deal with changes in a routine work setting. Given these limitations, the VE testified that such

claimant could not perform any jobs. If the hypothetical claimant's mental limitations were moderate, which was more than minimal, such claimant would still be precluded from performing any type of work.(Tr. 382-84)

Plaintiff completed a Function Report - Adult on December 23, 2005. She reported that when she crawled out of bed, she could barely function. She experienced numerous crying spells and took naps during the day. She could care for herself, cook meals, and clean her room, but she lacked energy. Plaintiff stated that she only went outside once or twice a month. She talked on the phone but did not go anywhere on a regular basis due to anxiety from leaving the house. Plaintiff reported that her mental conditions affected her ability to complete tasks, concentrate, and get along with others. She did not handle stress well. (Tr. 120-27)

Plaintiff's mother, Joan Chapman, also completed a Function Report Adult - Third Party. Ms. Chapman indicated that she spent little time with her daughter every day because Plaintiff was always depressed or sleeping. Plaintiff went outside only once every four months, and she only shopped once or twice a year. She talked on the phone daily but did not go anywhere on a regular basis. Ms. Chapman reported that Plaintiff had problems completing tasks, getting along with others, and concentrating. In addition, Plaintiff could not handle stress or changes in her routine. (Tr. 111-19)


### III.  Medical Evidence

On April 29, 2001, Plaintiff was treated at the emergency room of Christian Hospital Northwest after a suicide attempt by intentional drug overdose. Plaintiff was later transferred to St. John's Hospital with a diagnosis of Major Depression with psychotic features. Plaintiff also reported ongoing problems with her relationship with her mother. (Tr. 180-85, 206)

Plaintiff was admitted to St. John's Hospital on May 14, 2001 after threatening to kill herself with a razor. Plaintiff acknowledged that she was only suicidal when she became frustrated and angry at home. The physician noted that Plaintiff's symptoms were consistent with depression and borderline traits. She had been cutting herself recently. The physician diagnosed Major Depression and Borderline traits and discharged Plaintiff with plans to receive individual and family therapy. (Tr. 202-4)

On June 3, 2001, Plaintiff was admitted to DePaul Health Center for being physically out of control and for physical violence. Plaintiff threatened to take an overdose, jump off the balcony, and cut her wrists. Dr. Rashid Zia diagnosed Major Depression, ruled out early bipolar illness with unstable mood, and a GAF of 35. Dr. Zia recommended individual and group therapy and prescribed Zyprexa and Eskalith. Plaintiff was not psychotic, suicidal, or homicidal upon discharge on June 8, 2001.(Tr. 330-33)

On September 6, 2005, BJC Behavioral Health performed an Initial Adult Assessment of Plaintiff. She reported that she felt depressed, had trouble sleeping, cried daily, had trouble eating, experienced ruminating thoughts, had difficulty relaxing, and experienced increased irritability. She also reported poor concentration, feelings of worthlessness, and episodes of cutting herself 4 years prior. She also experienced panic attacks, during which time she experienced heart pounding, numbness, ear ringing, stomach aches, and diarrhea. She also worried constantly. Plaintiff denied hallucinations or manic symptoms; however, she endorsed periods of high energy and activity. Plaintiff's history included treatment in April 2001 at DePaul Health Center; a suicide attempt in May 2001; and treatment through BJC Behavior Health since February 2002. (Tr. 262)

The examiner noted that Plaintiff had constant mood swings during the examination. Plaintiff

cried and looked angry at times. She did not endorse symptoms of mania but acknowledged high energy, rapid thoughts, and periods of moving constantly. Plaintiff was diagnosed with Bipolar II Disorder, Generalized Anxiety Disorder, history of Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and cluster B personality traits. Plaintiff was also affected by her lack of income, insurance, and transportation. Her Global Assessment Functioning (GAF) was 55/60.[2] The examiner recommended high intensity community based services. (Tr. 268-270)

On September 12, 2005, Dr. Muhammad Baber evaluated Plaintiff. She reported that she needed to get her medication. Plaintiff reported feeling depressed for 2 to 3 years, along with feelings of hopelessness and worthlessness. She sometimes experienced shortness of breath, chest discomfort, and shaking during stressful situations. Plaintiff denied any auditory hallucinations or paranoia. She acknowledged having intrusive thoughts which were difficult to eliminate. Dr. Baber diagnosed Major Depressive Disorder and indicated the he needed to rule out Post-Traumatic Stress Disorder, Bipolar Type II, and Borderline Personality. Dr. Baber also noted that Plaintiff had low self-esteem and poor coping skills. Her GAF was 65.[3] Dr. Baber prescribed Lexapro and advised Plaintiff to return in one month and attend supporting therapy. (Tr. 243-44)

An Individual Treatment & Rehabilitation Plan through BJC Behavior Health starting October 2005, with a target date of October 2006, articulated several goals that Plaintiff wished to achieve. Plaintiff wanted to follow through with all scheduled psychiatric appointments and take her

---

[2] A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000)

[3] A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

medications as prescribed; obtain her GED; obtain part-time employment; increase social relationships and activities; and increase independent living status by applying for SSID and Medicaid. (Tr. 252-60)

Plaintiff attended monthly follow-up appointments with Dr. Baber between October of 2005 and April of 2006. On October 10, 2005, Plaintiff reported feeling better. Her concentration was better, and her memory was always fine. She was better able to control her mood swings. Plaintiff also reported an increased energy level, which allowed her to do more things. Plaintiff stated that her crying spells had decreased, and she felt less hopeless and helpless. Dr. Baber diagnosed Major Depressive Disorder and advised Plaintiff to continue taking 10 mg of Lexapro, as Plaintiff admitted not taking her medication regularly. Dr. Baber did note, however, that Plaintiff had a fair response to the medication. (Tr. 249)

On November 14, 2005, Dr. Baber again assessed Major Depressive Disorder. Plaintiff reported some depressive symptoms, including crying spells and feelings of hopelessness and helplessness. Dr. Baber noted that Plaintiff had very low frustration tolerance. Dr. Baber increased the dosage of Plaintiff's Lexapro to 20 mg. (Tr. 246) Plaintiff returned to Dr. Baber on December 12, 2005. Plaintiff reported that she decreased her Lexapro from 20 mg to 10 mg because the increased dose did not change much but kept her sedated. Plaintiff stated that she stayed home most of the time and watched TV. Plaintiff's crying spells were low, but she reported being very lonely. Plaintiff tended to push people away, and Dr. Baber noted that Plaintiff's problems were mainly personality issues. (Tr. 245)

On January 12, 2006, Plaintiff reported chronic suicidal thoughts but denied having any intent or plan. Plaintiff stated that she felt empty most of the time; however she described her mood as

good. Dr. Baber continued Plaintiff on her current medication. (Tr. 242) Plaintiff again reported suicidal thoughts without intent or plan on February 20, 2006. She stated that she ran out of Lexapro. Dr. Baber assessed Major Depressive Disorder, recurred, and advised Plaintiff to continue taking Lexapro. (Tr. 241)

On March 20, 2006, Plaintiff complained that she started to worry a lot and had thoughts of not living anymore. However, Plaintiff was preparing to take the GED exam. Dr. Baber assessed Major Depressive Disorder, prescribed Trazodone, and continued Plaintiff on Lexapro. (Tr. 240) During her final visit with Dr. Baber on April 20, 2006, Plaintiff reported that the Trazodone was not effective and made her more tired, so she stopped taking the medication. Dr. Baber prescribed Cymbalta. (Tr. 239)

Dr. Baber completed a Mental Medical Source Statement on January 12, 2006. With regard to activities of daily living, Dr. Baber opined that Plaintiff had mild limitations in her ability to function independently and maintain reliability. Her ability to cope with normal work stress and behave in an emotionally stable manner was moderately limited. Dr. Baber reported that Plaintiff showed marked limitation in her ability to relate in social situations. Plaintiff's ability to accept instructions and respond to criticism and maintain socially acceptable behavior was moderately limited, and she displayed a mild limitation in her ability to interact with the general public. Plaintiff had mild limitations in her ability to understand and remember simple instructions; make simple work-related decisions; maintain regular attendance and be punctual; maintain attention and concentration for extended periods; perform at a consistent pace without an unreasonable number and length of rest periods; and sustain an ordinary routine without special supervision. However, Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions

from symptoms; respond to changes in a work setting; and work in coordination with others. (Tr. 223-224)

Dr. Baber further opined that Plaintiff did not have a substantial loss of ability to understand, remember, and carry out simple instructions or loss of ability to make judgments that are commensurate with the functions of unskilled work. Plaintiff did have a substantial loss of ability to respond appropriately to supervision, co-workers, and usual work situations and loss of ability to deal with changes in a routine work setting. Dr. Baber stated that these limitations lasted 12 continuous months, or could be expected to last 12 continuous months at the assessed severity, noting that Plaintiff's disability began in 2000. Dr. Baber diagnosed Major Depressive Disorder, recurrent and Borderline Personality.[4] Dr. Baber explained that Plaintiff's main problem involved personality issues. He noted that her depressive symptoms seemed to fluctuate with the level of stress in her life. Plaintiff was currently stable with medications. (Tr. 225-26)

On January 6, 2006, Amy Brown Gander, M.S.W., LCSW, a Youth and Family Therapist, drafted an assessment summary. She noted that Plaintiff's treatment began on July 8, 2005. Plaintiff sought counseling for symptoms related to anxiety and depression, and she reported feeling worried and having obsessive thoughts. Ms. Gander noted that Plaintiff attended three sessions, during which time Plaintiff reported that she had difficulty obtaining employment due to her feelings of anxiety, worry, and depression. Plaintiff was learning relaxation techniques to help her cope with anxiety, and she reported that medication was somewhat helpful. Ms. Gander noted, however, that her brief

---

[4] A personality disorder is the "general term for a group of behavioral [disorders] characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning." 570 Stedman's Medical Dictionary (28th ed. 2006).

exposure to Plaintiff limited her ability to speak more specifically to her physical, social, and emotional functioning. (Tr. 216)

On March 6, 2006, Kyle W. DeVore, Ph.D., completed a Psychiatric Review Technique Assessment. Dr. DeVore stated that Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria in Affective Disorders. He assessed a diagnosis of Major Depressive Disorder and rule out Bipolar disorder. With regard to Anxiety-Related Disorders, Dr. DeVore noted that a treatment provider had diagnosed rule out Post-Traumatic Stress Disorder. Further, he noted that treatment providers had diagnosed Borderline Personality disorder but that her impairment did not precisely satisfy the personality disorder criteria. Dr. DeVore opined that Plaintiff had a moderate degree of limitation in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. He expected that Plaintiff would have one or two episodes of decompensation of extended duration. (Tr. 152-165)

Dr. DeVore also completed a Mental Residual Functional Capacity Assessment, wherein he noted that Plaintiff was either moderately limited or not significantly limited in her ability to understand and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. DeVore specified that Plaintiff's limitations included an avoidance of work involving intense or extensive interpersonal interaction; handling complaints or dissatisfied customers; close proximity to co-workers; and public contact. However, Plaintiff had the ability to understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers and supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 166-68)

Robert E. Schlitt, Ph.D., performed a psychological examination of Plaintiff on April 7, 2006, at the request of Plaintiff's attorney. Plaintiff reported that she took Lexapro which helped but did

11

not eliminate her severe anxiety or depression. She admitted that she did not take her medication as prescribed. Plaintiff reported difficulty sleeping and a history of sexual abuse. She also expressed feelings of suicide, compulsive hand-washing, mind racing, visual hallucinations, and nightmares. Dr. Schlitt opined that Plaintiff was a person in significant distress, with suspected histrionic, borderline, and passive aggressive personality features. Her profile could also include obsessive compulsive and paranoid traits. Dr. Schlitt further opined that Plaintiff's anxiety at times limited her ability to function outside the home, and her condition significantly impaired her ability to be gainfully employed. Dr. Schlitt diagnosed Mood Disorder, not otherwise specified; Anxiety Disorder, not otherwise specified; Attention Deficit Hyperactive Disorder; Past sexual abuse; and Social Anxiety Disorder, by history. He also assessed suspected personality disorder with histrionic, borderline and passive/aggressive characteristics. Plaintiff's Psychosocial Stressors included severe mood issues, severe anxiety, social isolation, personality issues, ADHD, concern over traits she inherited, described dysfunctional family system, limited education, unemployment, past sexual abuse, and described past emotional and physical abuse. Dr. Schlitt further assessed a GAF of 40.[5] (Tr. 227-34)

According to a Medical Source Statement - Consultative Examination completed by Dr. Schlitt on April 17, 2006, Plaintiff exhibited marked limitations in her ability to cope with stress, function independently, behave in an emotionally stable manner, and maintain reliability. Plaintiff's social functioning was extremely limited in her ability to accept instructions and respond to criticism. She displayed marked limitations in her ability to relate in social situations, interact with general public, and work in coordination with others. Plaintiff's ability to maintain socially acceptable

---

[5] A GAF of 31 through 40 represents "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34.

behavior was moderately limited.  In addition, while Plaintiff's ability to understand and remember simple instructions was only mildly limited, she was extremely limited in her ability to maintain attention and concentration for extended periods and sustain an ordinary routine without special supervision.  Plaintiff showed marked limitations in her ability to make simple work-related decisions, maintain regular attendance and be punctual, and perform at a consistent pace.  In addition, Dr. Schlitt opined that Plaintiff had a substantial loss of ability to perform basic mental activities in regular, competitive employment.  He listed Plaintiff's onset date as 2001 and opined that her limitations lasted 12 continuous months.  Dr. Schlitt further stated that Plaintiff's severe depression, severe anxiety, ADHD, social anxiety, and personality disorder prevented her from working full time. (Tr. 235-36)

### IV.  The ALJ's Determination

In a decision dated February 23, 2007, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  She had a medically determinable "severe" impairment or combination of impairments including major depressive disorder and borderline personality disorder.  However, these impairments did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  The ALJ determined that Plaintiff's allegations regarding her limitations were not credible.  After carefully considering all of the medical opinions regarding the severity of Plaintiff's impairments, the ALJ found that she had no exertional limitations and could only understand and perform work that had no more than simple one- or two-step instructions and required less than significant contact with the general public, supervisors, and co-workers.  (Tr. 21-22)

The ALJ further considered Plaintiff's younger age, limited education, and lack of past

relevant work and relied on the Medical-Vocational Guidelines to determine that Plaintiff was not disabled. Instead, the ALJ found that a significant number of jobs existed in the state economy which Plaintiff could perform, including work as an assembler. Thus, the ALJ concluded that Plaintiff was not under a "disability" as defined in the Social Security Act and was not entitled to disabled adult child's benefits. (Tr. 22-23)

Specifically, the ALJ considered the medical evidence, noting that, although Plaintiff alleges an onset date of April 1, 1999, she received treatment for mental impairments only occasionally before 2001. The ALJ noted Plaintiff's suicide attempt and threats and the subsequent hospitalizations. The ALJ also noted the lack of mental health treatment between June of 2001 and July of 2005 and found that this lack of treatment undermined Plaintiff's credibility. The ALJ assessed Plaintiff's medical treatment through Youth in Need in 2005, noting the implication that Plaintiff had not been taking medications for her mental impairments between 2001 and 2005. Further, records from BJC Behavioral Health did not establish a pattern of mental health symptoms common to those with significant and disabling mental impairments, as she improved throughout the course of treatment. (Tr. 14-16)

The ALJ also assessed the records from Dr. Baber, Plaintiff's treating physician. The ALJ noted that Dr. Baber did not indicate that Plaintiff's mental impairments precluded all types of work. Instead, Dr. Baber stated that her impairments led to mild-to-moderate limitations to her functioning ability, except for a marked limitation in her ability to relate to social situations. Dr. Baber also indicated that Plaintiff had a substantial loss in her ability to deal with workplace changes and respond appropriately to supervision, co-workers, and usual work situations. The ALJ also noted that Dr. Baber assessed a GAF score of 65. (Tr. 16)

The ALJ evaluated the medical source statement from Dr. Schlitt, noting that the examination was a product of an attorney referral, not an attempt to seek treatment for Plaintiff's symptoms. The ALJ also noted Dr. Schlitt's diagnoses and his opinion that Plaintiff had marked limitations in her ability to function. Dr. Schlitt additionally assessed a GAF score of 40. The ALJ found that Dr. Schlitt failed to specify what objective medical evidence led to his conclusions, indicating that Dr. Schlitt based his opinion on Plaintiff's assertions. Further, the ALJ noted that Dr. Schlitt's opinion sharply contrasted the other medical evidence in the record, and most notably from Dr. Baber's assessment. The ALJ found Dr. Schlitt's opinion less persuasive based on the disparity between his opinion and her treating physician's opinion and on Dr. Schlitt's unfamiliarity with Plaintiff's impairments. (Tr. 16-17)

The ALJ relied on Dr. Baber's opinion that Plaintiff had mild-to-moderate limitations to her activities of daily living. Specifically, the ALJ noted that Plaintiff expressed a desire to work part-time and received higher GAF scores. In addition, Dr. Baber indicated mild-to-moderate limitations to Plaintiff's ability to function socially. The ALJ also discussed medical records indicating that Plaintiff was intelligent and concluded that Plaintiff's limitations to her concentration, persistence, and pace were no more than moderate. (Tr. 18)

Further, while the record demonstrated that Plaintiff had a loss in her ability to deal with workplace changes and respond appropriately in usual workplace situations, the ALJ noted the fact that Dr. Baber did not indicate a substantial loss to Plaintiff's ability to understand, remember, and carry out simple instructions or make judgments commensurate with unskilled work. The ALJ relied on Plaintiff's most recent GAF score, excluding Dr. Schlitt's score, of 65 to determine that Plaintiff had only mild limitations to her ability to keep a job. The ALJ further determined that Plaintiff would

have only one or two episodes of decompensation in a work-like setting, demonstrating that her mental impairments were not disabling. (Tr. 18-19)

The ALJ found that Plaintiff's mental impairments did not meet a listing because she did not present medical documentation of a severe impairment that would meet at least two of the four "B Criteria" factors. The ALJ recognized that if all of Plaintiff's allegations were fully credible, she would not be able to work. However, based on the record, the ALJ determined that Plaintiff had no exertional limitations and could only understand and perform work that had no more than simple one- or two-step instructions and required less than significant contact with the general public, supervisors, and co-workers. The ALJ noted that no examining or treating physician who was a medically acceptable source contradicted this RFC. Although Plaintiff had no past relevant work history, the ALJ relied on the Medical-Vocational Guidelines, in conjunction with Plaintiff's RFC, age, education, and work experience, to determine that she was not disabled. Specifically, the ALJ noted that Plaintiff was a 20-year-old individual with an 8th grade education. (Tr. 19-21)

Finally, the ALJ relied on the VE's response to the hypothetical question regarding whether an individual with Plaintiff's age, education, training, past relevant work experience, RFC, and limitations could perform work. The ALJ concluded that Plaintiff could work as an assembler and that 10,000 such jobs existed in the local economy. Thus, the ALJ concluded that Plaintiff had the ability to perform work that existed in significant numbers in the national economy and that she was not disabled or eligible for Supplemental Security Income or disabled adult child's benefits. (Tr. 21)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from

a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and

consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[6] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak , 49 F.3d at 1354.

---

[6]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## VI. Discussion

Plaintiff argues that substantial evidence does not support the ALJ's findings and conclusions because the ALJ failed to include a narrative discussion of the rationale for his RFC assessment, failed to conduct a function-by-function assessment of Plaintiff's RFC, and reached an RFC conclusion that was contrary to the conclusions of Plaintiff's treating physician, the consultative examiner, and disability determinations. Defendant contends that the ALJ adequately supported his RFC determination with evidence in the record and submitted a proper hypothetical question to the VE. Thus, the Defendant maintains that substantial evidence supports the ALJ's finding that Plaintiff could perform work existing in significant numbers in the national economy.

The undersigned finds that the ALJ erred in his RFC assessment and that the case should be remanded for further review. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). This evidence includes

descriptions and observations of the claimant's limitations from the alleged impairment(s) and symptoms provided by the claimant and by family, neighbors, friends, or other persons. 20 C.F.R. § 416.945(a)(3). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).

The Plaintiff argues that the ALJ erred in assessing her RFC because he failed to provide a narrative discussion describing how the evidence supports the ALJ's conclusions. The undersigned agrees. Although the ALJ did assess the medical evidence, the ALJ jumped to the conclusion that the Plaintiff was capable of performing work-related activities involving simple instructions and "less than significant" contact with the public, supervisors and co-workers. However, the ALJ failed to include a properly supported discussion demonstrating that Plaintiff had the ability to work in an ordinary work setting on a regular and continuing basis, despite these limitations. (Tr. 20) The ALJ simply stated that the RFC was not contradicted by any medically acceptable source. (Tr. 20)

More importantly, the ALJ did not provide an explanation regarding which medical evidence supported his RFC determination. Indeed, Dr. Baber, upon whose opinion the ALJ primarily relied, found that Plaintiff had marked limitations in her ability to relate in social situations and had substantial losses in her ability to respond appropriately to supervision, co-workers and usual work situations and her ability to deal with changes in a work setting. These limitations appear to require more than "less than significant" contact with others, and the ALJ should have either given proper weight to Dr. Baber as Plaintiff's treating physician or discounted the opinion in accord with Eighth Circuit case law. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Further, the ALJ completely ignored Plaintiff's testimony and other reports contained in the record, including a report provided by Plaintiff's mother. Those reports indicated that Plaintiff took numerous naps throughout the day, performed very few chores, and experienced severe anxiety regarding leaving the house. (Tr. 111, 113-14, 120-23) The ALJ acknowledged that in determining Plaintiff's RFC, the ALJ must give full consideration "to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." (Tr. 19) The ALJ also noted that, if Plaintiff's allegations were fully credible, she would not be able to work. The ALJ then concluded that Plaintiff could work, without any assessment of Plaintiff's subjective complaints, including her daily activities; the duration, frequency and intensity of her symptoms; or precipitating and aggravating factors, among other Polaski factors.

Under Polaski, the ALJ cannot simply reject a Plaintiff's subjective complaints because the objective medical evidence does not support those complaints. Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008). ALJ is required to make express credibility determinations setting forth his reasons for discrediting Plaintiff's complaints. Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). The ALJ may disbelieve Plaintiff's subjective complaints based on inconsistencies in the evidence as a whole; however, "he must give reasons for discrediting the claimant." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted). Here, the ALJ failed to properly give his reasons for discrediting Plaintiff. The ALJ seems to have discredited her based upon a lack of treatment and medication during a portion of her alleged disability and on some stray remark that she wanted to work part-time. (Tr. 15, 18) Review of the opinion indicates that the ALJ based his denial of benefits solely on the objective evidence, without accounting for Plaintiff's subjective complaints and her

mother's report that Plaintiff napped frequently and refused to leave the house, among other complaints. As such, substantial evidence does not support the ALJ's determination that plaintiff can work, where "work" requires an ability to perform on a daily basis in a competitive and stressful work environment. Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001) (citations omitted); see also SSR 96-8p (RFC is an assessment of an individual's ability to perform sustained work-related activities in a work setting for eight hours a day, five days a week, or the equivalent work schedule).

The undersigned therefore finds that this case should be remanded to the ALJ for further review. On remand, the ALJ should further develop Plaintiff's subjective complaints and her daily activities in order to make a proper credibility determination. In addition, the ALJ should explain his assessment of Plaintiff's RFC with references to specific evidence in the record. Finally, to the extent that the ALJ modifies Plaintiff's RFC, he should submit a new hypothetical question to a VE in determining whether Plaintiff is capable of performing work that exists in significant numbers in the national economy.

Accordingly,

**IT IS HEREBY RECOMMENDED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for

good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __20th__ day of February, 2009.